WENDELL JUSTIN WILLIAMSON, PLAINTIFF V. MYRON B. LIPTZIN, M.D., DEFENDANT

No. COA99-813

(Filed 19 December 2000)

**Negligence— psychiatrist—patient care—no proximate cause—injuries too remote in time**

The trial court erred by failing to grant defendant psychiatrist's motion for a directed verdict and thereafter his motion for judgment notwithstanding the verdict in an action where plaintiff, a twenty-four-year-old law student and defendant's patient, sought damages based on defendant's alleged negligent treatment of plaintiff's mental illness which allegedly caused plaintiff to randomly shoot and kill two people eight months after plaintiff's last session with defendant despite never expressing any intent to do so, because: (1) there was no showing of proximate cause of plaintiff's injuries when there was no evidence that plaintiff posed a threat of violence to others which would in turn lead to injury, plaintiff's own expert stated he was not sure that he would go so far as to conclude that plaintiff's dangerousness to himself or others was foreseeable, another of plaintiff's experts also testified that it was not foreseeable that plaintiff would kill others, and plaintiff's own behavior prior to or at the time of defendant's retirement in no way indicated that he would become violent; (2) plaintiff's injuries were too remote in time and the chain of events which led to plaintiff's injuries was too attenuated for defendant's actions to be the proximate cause of plaintiff's injuries of being wounded during a shootout, being

1

WILLIAMSON v. LIPTZIN

[141 N.C. App. 1 (2000)]

tried for capital murder, being committed to a mental institution, and not being able to continue his legal studies or pursue a possible career; (3) North Carolina courts are reluctant to hold a person liable where the chain of events which led to the resulting injuries is unforeseeable, remote, and attenuated, even though some injury to plaintiff was possible; (4) evidence of risk factors for potential violence such as gun ownership, being under a certain age, or being of a certain gender, implicates a large portion of the population and is insufficient in and of itself to prove foreseeability; (5) the uncertainties in diagnosing diseases of the human mind and predicting future behavior were further hampered by the setting in which defendant observed plaintiff, which was an outpatient student health care facility intended for short-term treatment; and (6) public policy concerns show that imposing liability on a psychiatrist in an outpatient short-term care setting for the actions of a patient that are at most based on risk factors and not foreseeability would have adverse affects on psychiatric care when North Carolina's policy on the mentally ill promotes less restrictive methods of treatment and more patient autonomy.

Appeal by defendant from order entered 4 September 1998 by Judge Wade Barber in Superior Court, Orange County, and from judgment entered 7 October 1998 and order entered 31 March 1999 by Judge James C. Spencer, Jr. in Superior Court, Orange County. Heard in the Court of Appeals 17 April 2000.

*Smith, James, Rowlett & Cohen, L.L.P., by Seth R. Cohen, and Gordon & Nesbit, P.L.L.C., by L. G. Gordon, Jr., for plaintiff-appellee.*

*Pipkin, Knott, Clark & Berger, L.L.P., by Bruce W. Berger, and Smith, Helms, Mulliss & Moore, L.L.P., by James G. Exum, Jr., Matthew W. Sawchak and Hampton Y. Dellinger, for defendant-appellant.*

*Kilpatrick Stockton, L.L.P., by Noah H. Huffstetler, III, for North Carolina Psychiatric Association, American Psychiatric Association, American Medical Association, North Carolina Medical Society, North Carolina Psychological Association, North Carolina Hospital Association and American Psychological Association, amici curiae.*

TIMMONS-GOODSON, Judge.

This case arises out of the tragic events of 26 January 1995, when Wendell Williamson ("plaintiff") shot and killed two people in downtown Chapel Hill, North Carolina. Plaintiff brought suit against Myron B. Liptzin ("defendant"), a psychiatrist at Student Psychological Services of the University of North Carolina at Chapel Hill ("Student Services") who treated plaintiff, on the grounds that he was damaged by the negligence of defendant.

The evidence presented at trial tended to show the following. Student Services operates only on a voluntary, outpatient basis. In May 1990, as an undergraduate student, plaintiff visited Student Services as a "walk-in," and received counseling for relationship issues and academic problems. The doctor who reviewed plaintiff's intake form concluded that plaintiff's problems were "fairly normative."

In September 1992, when plaintiff was a twenty-four-year-old law student at the University of North Carolina at Chapel Hill ("UNC"), he screamed at students on campus and struck himself about the face. Plaintiff was referred to Student Services. As a result, Student Services further referred him to the UNC Hospitals, where he was involuntarily committed. During his stay, plaintiff disclosed that he had been hearing a voice talking to him for eight months and that he believed he was telepathic. The hospital staff recorded that plaintiff possessed a gun in his apartment.

Plaintiff refused to voluntarily remain at the hospital and also refused medication. A court petition was filed to have plaintiff involuntarily committed. Following a commitment hearing, the presiding judge denied the petition and recommended that plaintiff seek outpatient psychiatric counseling. The final primary diagnosis was "rule/out schizophrenia." One of plaintiff's expert psychiatrists explained at trial that the term "rule/out schizophrenia" means that either: (a) "it's [schizophrenia] until proven otherwise, but we haven't had enough time to prove otherwise yet[,]" or (b) "you should keep [schizophrenia] first and foremost in your mind until a less serious condition is shown to be causing the problem."

On 2 March 1994, plaintiff was again referred to Student Services after he disrupted class at the law school by announcing that he was a "telepath." Plaintiff completed an intake form on which he denied any urge "to hit, injure or harm someone" or any "[s]uicidal thoughts or concerns." Intake psychologists assessed that involuntary hospi-

talization was "not appropriate as student denies danger to self or others." Plaintiff was again diagnosed with "rule/o[ut] schizophrenia." The staff recommended treatment and medication, which plaintiff refused. However, after a law school dean informed plaintiff that he might not be recommended as a candidate for the bar exam unless he received counseling, plaintiff agreed to seek treatment.

During a ten-week period beginning on 8 March 1994, plaintiff had six counseling sessions with defendant at Student Services, each of which lasted between twenty minutes and one hour. Defendant prepared for the treatment by reviewing plaintiff's chart from Student Services, which included an intake form from plaintiff's May 1990 visit to Student Services and a "discharge summary" from his 1992 hospital stay. However, defendant did not review the complete medical records from plaintiff's 1992 treatment. During the first session with defendant, plaintiff stated that he had believed he was a "telepath" for two years, he consumed approximately six beers each night, and he used marijuana occasionally. Defendant suggested that plaintiff begin taking an antipsychotic drug, Navane, and diagnosed plaintiff with "delusional disorder grandiose." While defendant recognized that plaintiff exhibited some symptoms of schizophrenia, he decided to record the more "generous" diagnosis, so as not to deprive plaintiff of the opportunity to practice law.

On 5 April 1994, during the fourth counseling session, defendant informed plaintiff that defendant would be leaving Student Services in June, and suggested that plaintiff "consider the possibility of seeing somebody on a regular basis in therapy, and that [defendant] would be happy to make a referral for him; that it would probably make sense to do this sooner rather than later."

The last counseling session between plaintiff and defendant occurred on 25 May 1994. Plaintiff informed defendant that he was not sure whether he would stay in Chapel Hill for the summer or whether he would stay with his family in Clyde, North Carolina. Defendant recorded in plaintiff's medical chart that plaintiff knew defendant would be leaving Student Services and that plaintiff would be seeing his replacement in the fall semester. Defendant told plaintiff that he needed to contact defendant's replacement so that he could have his prescriptions filled.

During plaintiff's final counseling session, defendant supplied plaintiff with a prescription for thirty Navane capsules. Defendant recorded that plaintiff was "content to stay on [Navane]." As plain-

tiff's plans for the summer were uncertain, defendant instructed plaintiff that if he returned to Clyde, he was to visit the community health center or see his family doctor. If, on the other hand, plaintiff remained in Chapel Hill, he was to return to Student Services for counseling with defendant's replacement.

During the course of his treatment, plaintiff followed virtually all of defendant's instructions concerning the regularity with which he was to take his medication. Plaintiff testified that he did on one occasion "voluntarily [go] off his medication," but reported it to defendant. Plaintiff reported that he was no longer hearing voices, his "telepathy" and delusions were completely gone, and his hallucinations were either completely gone or virtually gone. Although he still used alcohol and recreational drugs, his usage had decreased. Plaintiff attended all of his classes without incident, sat for his law school exams, improved his grades, and took part in a law school writing competition. Friends reported that plaintiff was "more 'like his old self.' " While he was under defendant's care, plaintiff had no thoughts of harming or killing himself or anyone else. His first thoughts of harming others occurred "much later" or "some number of months" after he last saw defendant.

Plaintiff believed that his mental illness was temporary and that the medication was a short-term measure. According to plaintiff, defendant told him "that in his opinion, [plaintiff] was probably not really schizophrenic or psychotic." Plaintiff further stated that defendant told him that "if someday [he] wanted to go off the medication, that [he] could do that if [he] told someone [he] trust[ed]."

Plaintiff spent the summer at his parents' home in Clyde. He did not visit the community health center or Student Services. Plaintiff decided to stop taking Navane for a few days, as the drug made him susceptible to the sun and he had become sunburned. After he discontinued his medication, plaintiff felt physically better. He determined that he would stop taking his medication indefinitely and informed his parents of that decision.

Plaintiff returned to Chapel Hill in August 1994 for the fall semester. He attended virtually all of his classes and did not disrupt any of them. He passed all of his courses, managed his finances, and took care of his day-to-day needs, such as grooming, eating, and shopping. He took trips alone in his car, including trips to Connecticut and New York City over Christmas break.

In January 1995, plaintiff returned to Chapel Hill and began living out of his car. He stopped attending classes and purchased guns and ammunition. In addition, plaintiff returned to Clyde to retrieve a M-1 rifle, the gun UNC Hospital staff noted he possessed. This weapon had been in Clyde since plaintiff's hospital stay in 1992. On 26 January 1995, eight months after his last session with defendant, plaintiff randomly fired the M-1 rifle at unarmed people in downtown Chapel Hill, killing two of them. In an effort to stop plaintiff, police officers shot him in the legs. Plaintiff required surgery for the leg wounds. Plaintiff was charged with two counts of first-degree murder. In November 1995, he was found not guilty by reason of insanity.

Psychiatrist Stephen Kramer ("Dr. Kramer") testified as an expert witness on behalf of plaintiff. Dr. Kramer stated that defendant violated the standard of care for a psychiatrist with similar training and experience practicing in Chapel Hill, North Carolina, or similar communities, in 1994. Dr. Kramer specified that defendant failed "to pursue a proper diagnosis, including review of old records available and assessing risk for potential deterioration and violence[,]" failed "to develop a program for continuing care [for plaintiff] once [defendant] retired and left the Student Health Center," failed to address the issue of noncompliance, and failed to properly manage the use of antipsychotic medication. Dr. Kramer noted that the discharge summary from plaintiff's hospital stay indicated that he had no insight into his illness and that he had a history of noncompliance. Dr. Kramer stated that especially in this context, if defendant advised plaintiff that he could go off his medication if he told a responsible adult, such advice would have been improper and an "invitation to not comply with the recommended therapy."

According to Dr. Kramer, the correct diagnosis was chronic paranoid schizophrenia rather than delusional disorder grandiose, and defendant's failure to review the medical records from plaintiff's inpatient stay at UNC Hospitals in 1992 contributed to the misdiagnosis. Dr. Kramer further noted that there was a marked difference between plaintiff's diagnosis of delusional disorder and schizophrenia. Dr. Kramer explained that schizophrenia is a long-term, lifelong illness requiring long-term care, while delusional disorder was more intermittent in nature.

Dr. Kramer testified that it was "harder to answer" whether defendant could have reasonably foreseen that plaintiff would become violent to himself or others. Dr. Kramer further testified:

First was, what's foreseeable is noncompliance with treatment, which would directly lead to exacerbation or increase in the psychotic symptoms, especially that of his thought processes. His insight and judgment would remain poor or get worse. He would continue abusing substances . . . . That access to a gun might not be cut off for him but might be reunited with him, and that dangerous behavior might occur.

Those elements regarding dangerousness may come together at a point in time.

When asked whether he was "prepared to say . . . a part of foreseeability would be dangerousness . . . to himself or others[,]" Dr. Kramer answered, "I'm not sure that I can go that far with it. I can say that the foreseeable elements are those that when they come together in time would lead to dangerousness." Had plaintiff received a proper diagnosis and treatment, his delusions and acting out could have been kept under control, according to Dr. Kramer.

James Bellard ("Dr. Bellard"), a psychiatrist, also testified as an expert witness on behalf of plaintiff. Dr. Bellard agreed that defendant violated the applicable standard of care by misdiagnosing plaintiff and failing to ensure that plaintiff received ongoing care, especially given plaintiff's history of noncompliance. Dr. Bellard stated that it was foreseeable that plaintiff would again believe he was a "telepath." When asked where that would lead, Dr. Bellard answered, "If I may, that's not what's foreseeable. What's foreseeable is that he would believe [he was a "telepath"] again. But what he would do with that, I don't think—nobody's crystal ball is that good, that they could predict that." Dr. Bellard further stated that if defendant had given plaintiff the name of a specific doctor to visit during the summer of 1994, Dr. Bellard still could not predict what would have happened. Dr. Bellard stated that "it was foreseeable that [plaintiff] would deteriorate and eventually decompensate, that he would really fall apart mentally, eventually." Once he began to deteriorate, plaintiff would certainly become dangerous to himself, according to Dr. Bellard. Both Drs. Kramer and Bellard acknowledged that plaintiff improved under defendant's care and stated that plaintiff made no expressions of violence and was not committable at any point during his treatment.

Psychologist John Warren, III ("Dr. Warren") testified on behalf of plaintiff as an expert witness in psychology and the treatment of paranoid schizophrenia. Dr. Warren stated that plaintiff was not com-

petent to take charge of his medical treatment at the time his therapy with defendant ended. Dr. Warren testified that

> there's nothing in the record that suggests that [plaintiff] got that information that he needed in order to make decisions about whether or not he had a major mental illness, whether or not he needed to take medication on a long-term basis, what he needed to do in case the symptoms got worse.

Plaintiff reported to Dr. Warren on the day following the shootings that defendant had advised him that he could discontinue his medication if he told someone he trusted.

Concerning schizophrenia, Dr. Warren echoed the testimony of Dr. Kramer stating that it was a very serious, major mental disorder, requiring lifelong treatment. Dr. Warren also testified that "[a]s a group, people with schizophrenia, paranoid type, are among the most likely to hurt themselves or hurt other people." Dr. Warren believed that because plaintiff did not understand the seriousness of his illness, he could not make competent decisions concerning treatment.

When asked whether it was foreseeable that defendant "might" degenerate and become dangerous to himself or others, Dr. Warren responded by stating that plaintiff would become sicker, which "might" result in violence to himself or others. Both Drs. Kramer and Warren testified that plaintiff exhibited risk factors for dangerous behavior such as being a young male, living alone, and having access to a gun.

Holly Rogers ("Dr. Rogers"), a psychiatrist at Duke University's Student Counseling Center, testified as an expert on behalf of defendant. Dr. Rogers indicated that student mental health centers provide "short-term treatment." Dr. Rogers stated that "[m]ost psychotic people aren't dangerous." Similarly, Jeffrey Janofsky ("Dr. Janofsky"), a psychiatrist at Johns Hopkins University, stated that "because the base rate of violence is so low, and most schizophrenics aren't violent and most normal people aren't violent either, that demographic data does not get you anywhere in predicting dangerousness."

Bruce Berger ("Dr. Berger"), a psychiatrist who previously worked as a student health counselor at East Carolina University, testified on behalf of defendant. He stated that in the student health setting, psychiatrists are only able to work with students for a short time "before [the students] have to make plans with or without [the psy-

chiatrists'] assistance to get further treatment, or at least make choices in their life."

Plaintiff filed suit against defendant on 16 May 1997, alleging that defendant had been negligent and that the negligence caused him to be shot in the legs, endure a murder trial, and be confined indefinitely to a mental institution. Defendant moved for summary judgment. On 4 September 1998, the trial court entered an order denying defendant's motion, concluding that "a genuine issue of material facts exist[ed] to show that [defendant] breached the applicable standard of care and that [defendant's] treatment proximately caused injury to [plaintiff]." The court further found that defendant failed to prove that there was no triable issue concerning contributory negligence.

The case was tried in the Superior Court, Orange County, before a jury. Defendant moved for directed verdict at the close of plaintiff's evidence and at the close of all the evidence. The trial court denied the motions and submitted the case to the jury, which determined that plaintiff was damaged by the negligence of defendant and that plaintiff was not contributorily negligent. Based on the jury verdict, the trial court entered judgment ordering defendant to pay $500,000 with interest and the court costs of the action to plaintiff. Defendant moved for a new trial or judgment notwithstanding the verdict. On 31 March 1999, the trial court entered an order denying the motions. Defendant appeals.

---

Defendant argues that the trial court erred in denying his dispositive motions. Defendant first contends that the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict ("JNOV"). *See* N.C. Gen. Stat. § 1A-1, Rule 50 (1999). A motion for JNOV is a renewal of a motion for directed verdict made after the jury has returned its verdict. As such, a JNOV "shall be granted if it appears that the motion for directed verdict could properly have been granted." N.C.G.S. § 1A-1, Rule 50(b)(1).

In deciding whether to grant or deny either motion, the trial court must accept the non-movant's evidence as true and view all the evidence "in the light most favorable to [him], giving [him] the benefit of every reasonable inference which may be legitimately drawn therefrom, with conflicts, contradictions, and inconsistencies being resolved in the [non-movant's] favor." *Bryant v. Thalhimer Brothers, Inc.*, 113 N.C. App. 1, 6, 437 S.E.2d 519, 522 (1993) (citation omitted),

*dismissal allowed and disc. review denied*, 336 N.C. 71, 445 S.E.2d 29 (1994). "If there is more than a scintilla of evidence supporting each element of the non-movant's claim, the motion should be denied." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted). An appellate court's review of a denial of these motions is limited to a consideration of "whether the evidence viewed in the light most favorable to [the non-movant] is sufficient to support the jury verdict." *Suggs v. Norris*, 88 N.C. App. 539, 543, 364 S.E.2d 159, 162 (1988) (citation omitted).

To prevail on a claim of negligence, the plaintiff must establish that the defendant owed him a duty of reasonable care, "that [the defendant] was negligent in his care of [the plaintiff,] and that such negligence was the proximate cause of [the plaintiff's] injuries and damage." *Beaver v. Hancock*, 72 N.C. App. 306, 311, 324 S.E.2d 294, 298 (1985) (citation omitted). While we recognize that this case presents a variety of novel issues concerning virtually every facet of negligence, we have chosen to focus our discussion on the element of proximate cause. Defendant's main contention on appeal is, in fact, that his alleged negligence was not the proximate cause of plaintiff's injuries, and therefore he was entitled to a directed verdict and JNOV. With this, we must agree.

North Carolina appellate courts define proximate cause as

a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) (citations omitted). The element of foreseeability is a requisite of proximate cause. *Id.* To prove that an action is foreseeable, a plaintiff is required to prove that "in 'the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.' " *Hart v. Curry*, 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953) (citation omitted). Thus, the plaintiff does not have to prove that the defendant foresaw the injury in its precise form. *Hairston*, 310 N.C. at 233-34, 311 S.E.2d at 565; *see also Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) ("It does not matter that [the actual injuries]

are unusual, unexpected, unforeseen, and unforeseeable.") However, the law does not require that the defendant "foresee events which are *merely possible* but only those which are reasonably foreseeable." *Hairston*, 310 N.C. at 234, 311 S.E.2d at 565 (emphasis added) (citations omitted).

> A man's responsibility for his negligence must end somewhere. If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered remote rather than a proximate cause. It imposes too heavy a responsibility for negligence to hold the [tort-feasor] responsible for what is unusual and unlikely to happen or for what was only remotely and slightly possible.

*Phelps v. Winston-Salem*, 272 N.C. 24, 30, 157 S.E.2d 719, 723 (1967) (citation omitted); *accord Sutton v. Duke*, 277 N.C. 94, 108, 176 S.E.2d 161, 169 (1970) (quoting William L. Prosser, *Law of Torts § 50*, at 303 (3d ed. 1964)) ("it is 'inconceivable that any defendant should be held liable to infinity for all the consequences which flow from his act,' [thus] some boundary must be set").

Foreseeability is but one element of proximate cause. *Wyatt v. Gilmore*, 57 N.C. App. 57, 290 S.E.2d 790 (1982). Other "equally important considerations" include:

> whether the cause is, in the usual judgment of mankind, likely to produce the result; whether the relationship between cause and effect is too attenuated; whether there is a direct connection without intervening causes; whether the cause was a substantial factor in bringing about the result; and whether there was a natural and continuous sequence between the cause and the result.

*Id.* at 59, 290 S.E.2d at 791 (citation omitted).

Plaintiff alleged that he was injured as a result of defendant's actions, in that he was wounded during the 26 January 1995 shootout, tried for capital murder, and confined to a mental institution. An examination of the evidence, construed in the light most favorable to the plaintiff, reveals that defendant could not foresee plaintiff's injuries. There was absolutely no evidence that plaintiff posed a threat of violence to others which would in turn lead to injury. When asked whether dangerousness to others or to plaintiff himself was foreseeable, plaintiff's own expert, Dr. Kramer stated, "I'm not sure

that I can go that far with it." Another one of plaintiff's experts, Dr. Bellard, likewise testified that it was not foreseeable that plaintiff would kill others. In fact, in the most telling testimony at trial, Dr. Bellard further responded, "[N]obody's crystal ball is that good[.]"

Plaintiff's own behavior prior to or at the time of defendant's retirement in no way indicated that he would become violent. Other than striking himself about the face, plaintiff never exhibited violent behavior. On his 2 March 1994 intake form, plaintiff noted that he had no urge to harm others and that he had no suicidal thoughts.

Plaintiff even noticed an improvement in his condition. Plaintiff informed defendant that he no longer heard voices and his hallucinations were virtually gone. Plaintiff further noted that he had decreased his use of alcohol and recreational drugs, had attended his law school classes without incident, and had improved his grades. Furthermore, although plaintiff testified that he contemplated suicide in 1992, he admitted that he never seriously thought of harming himself between the 1992 hospitalization and 1994, including the period in which he saw defendant. Plaintiff further affirmed that thoughts of harming others only occurred "some number of months" after his last visit with defendant. In his notes from the last visit with plaintiff, defendant wrote that plaintiff stated "his friends have been giving him feedback that he's more 'like his old self, and the guy they used to know and like.' "

In addition to being unforeseeable, plaintiff's injuries were too remote in time, and the chain of events which lead to plaintiff's injuries was too attenuated for defendant's actions to be the proximate cause of plaintiff's injuries. It was eight months between plaintiff's last visit with defendant and the incident which led to his injuries. Plaintiff was, by all accounts, functioning normally when he last visited defendant in May 1994. Plaintiff spent the summer with his parents in Clyde, at which time he discontinued his medication and failed to visit a mental health center or to have his prescriptions refilled. In August 1994, plaintiff returned to law school and began his fall classes. Plaintiff testified that his hallucinations began to resurface gradually and achieved fruition sometime in August or September. However, plaintiff attended virtually all of his classes during the fall semester, without disruption, and passed every course. He maintained his daily needs, including eating, grooming, shopping, and managing his financial affairs. Furthermore, after completing the semester, plaintiff took two long trips alone, after which time he returned to his parents' home in Clyde.

**WILLIAMSON v. LIPTZIN**

[141 N.C. App. 1 (2000)]

In January 1995, plaintiff returned to Chapel Hill. Only at this time did plaintiff begin living out of his car, stop attending classes, and purchase guns and ammunition. Eight months after his last visit with defendant, plaintiff shot and killed two individuals in Chapel Hill, despite never expressing any intent to do so. Defendant simply could not have foreseen that as a result of this attenuated chain of events, eight months after his last appointment, plaintiff, who expressed no violent intentions or threats, would be wounded during a shoot-out, tried for capital murder, committed to a mental institution, and not able to continue his legal studies or pursue a possible career.

Despite this attenuated chain of events, plaintiff contends that the testimony of his experts was tantamount to the issue of foreseeability and was more than sufficient to establish that "some" injury was foreseeable. With this argument, we cannot agree.

In his testimony, Dr. Kramer expressed difficulty in concluding that plaintiff's dangerousness to others was foreseeable. Dr. Kramer then testified as follows:

> [W]hat's foreseeable is noncompliance with treatment, which would directly lead to exacerbation or increase in the psychotic symptoms, especially that of his thought processes. His insight and judgment would remain poor or get worse. He would continue abusing substances . . . . That access to a gun *might* not be cut off for him but *might* be reunited with him, and that dangerous behavior *might* occur.
>
> Those elements regarding dangerousness *may* come together at a point in time. (Emphasis added.)

Dr. Kramer later testified that although he could not go so far as to say that plaintiff's dangerousness was foreseeable, "[he could] say that the foreseeable elements are those that when they come together in time would lead to dangerousness."

Dr. Bellard testified that it was foreseeable that plaintiff would again believe he was a "telepath" and "it was foreseeable that [plaintiff] would deteriorate and eventually decompensate, that he would really fall apart mentally, eventually." Dr. Bellard further testified that no one could predict "what [plaintiff] would do with that." Dr. Bellard stated that certain "risk factors" such as plaintiff's "self-injurious behavior, a history of psychosis, a history of being resistant to treatment, and an ongoing history of substance abuse," would place plaintiff at a "[c]onsiderably greater risk" for violence against himself. Dr.

Bellard could not definitively say that being at risk for violence to oneself was a "risk factor" for violence to others. Both Drs. Kramer and Warren stated that plaintiff's age, gender, his living alone, and his owning a gun were "risk factors" for violence.

The experts' testimony does not establish foreseeability but evinces a situation similar to those in which our appellate courts hesitate to find an individual liable for a possible breach of duty. In *Westbrook v. Cobb*, 105 N.C. App. 64, 411 S.E.2d 651 (1992), for example, the defendant's vehicle struck a utility pole connected to a transformer, which serviced the plaintiff's house. As a result, the plaintiff's house caught on fire. The plaintiff, who was one and one-half miles from his house, was alerted to the fire and arrived on the scene to assist firefighters in controlling the blaze. The plaintiff went into his house to retrieve some items, and in the process, injured his back. This Court found that "the chain of events resulting in [the plaintiff's] injury [was not] reasonably foreseeable and within the contemplation of an ordinary prudent individual." *Id.* at 68, 411 S.E.2d at 653. Thus, the Court found that proximate cause did not exist. *Id.* at 68-69, 411 S.E.2d at 653-54.

In *Coltrane v. Hospital*, 35 N.C. App. 755, 242 S.E.2d 538·(1978), the Administratrix of the estate of a deceased patient brought an action against a hospital for the death of the patient, who fell from a second story ledge. The patient had been placed in restraints to prevent him from falling out of his bed. The patient wrestled free from the restraints and was seen standing on the second story ledge. The patient was later found dead. Our Court concluded that any negligence which could be imputed to the hospital was not the proximate cause of the patient's death because "there [was] no evidence that defendant hospital could have foreseen the fall from the ledge of the second floor." *Id.* at 758, 242 S.E.2d at 540. In so concluding, this Court relied on the testimony of the patient's doctor, who stated that the restraints were only to keep the patient from falling out of the bed and that he did not view the patient as suicidal. *Id.*

Although not completely analogous to the case at bar, these cases illustrate that North Carolina courts are reluctant to hold a person liable where the chain of events which led to the resulting injuries is unforeseeable, remote, and attenuated, even though "some" injury to plaintiff was "possible." *See Hairston*, 310 N.C. at 234, 311 S.E.2d at 565 (citations omitted). The contemplation of what "might" happen, which leads to what "might" or "may" potentially be the outcome, and

the consideration of "risk factors" for violence to oneself which may or may not lead to a risk of violence to others, is simply not sufficient as a matter of law to establish the foreseeability of plaintiff's injuries or the circumstances in which the alleged injuries arose. Furthermore, evidence of "risk factors" for potential violence, such as gun ownership, being under a certain age, or being of a certain gender, implicates a large portion of our population and is simply insufficient in and of itself to prove foreseeability. Given the lack of evidence of violence or any threats of violence on plaintiff's behalf, "the connection between negligence and the injury appears unnatural, unreasonable, and improbable." *Phelps*, 272 N.C. at 30, 157 S.E.2d at 723 (citation omitted). We therefore conclude that the expert testimony presented by plaintiff established what was merely possible and not what was reasonably foreseeable.

Plaintiff also argues that evidence of foreseeability in the instant case far surpasses the evidence presented in *Hairston*, 310 N.C. 227, 311 S.E.2d 559, and in other cases in which our appellate courts have deemed proximate cause an issue for the jury. Plaintiff contends that like the defendant in *Hairston*, defendant in the case *sub judice* should have foreseen an injury would result from his actions. We find *Hairston* distinguishable from the present case.

In *Hairston*, our Supreme Court examined the liability of a car dealership in a wrongful death suit by a deceased motorist's wife against the dealer and a truck driver. On the same day as the accident which led to the suit, the motorist purchased an automobile from defendant dealer. While the motorist waited, the dealer changed the tires on the vehicle, but failed to tighten the lug nuts on one of the wheels. The motorist drove the car out of the dealer's lot and within minutes, the loose wheel fell off. The motorist stopped the car, and a van pulled up behind the disabled vehicle. As the motorist stood between his car and the van, the defendant truck driver struck the van, killing the motorist.

Our Supreme Court held that proximate cause existed to hold the dealer liable for the motorist's death. *Id.* at 235, 311 S.E.2d at 566. The court found that the dealer could have foreseen the accident which led to plaintiff's injuries. *Id.* The Court noted that defendant dealer was on "notice of the exigencies of traffic, and he must take into account the prevalence of the 'occasional negligence which is one of the incidents of human life.' " *Id.* at 234, 311 S.E.2d at 565 (citations omitted).

In the case at bar, plaintiff's violent rampage occurred eight months after his final session with defendant, while the time between the dealer's negligence and the motorist's harm in *Hairston* was "barely six minutes." *Id.* at 238, 311 S.E.2d at 567. More importantly, treating plaintiff's mental illness and predicting future human behavior are vastly different than maintaining an automobile and predicting traffic. Indeed, this Court as well as courts in other jurisdictions have previously recognized the difficulties inherent in the treatment and diagnosis of mental illness. In *Pangburn v. Saad*, 73 N.C. App. 336, 326 S.E.2d 365 (1985), this Court stated:

> "The uncertainties inherent in analyzing and treating the human mind, let alone the decision of when a person is 'cured' and no longer a danger, renders the decisions of skilled doctors highly discretionary and subject to rebuke only for the most flagrant, capricious, and arbitrary abuse."

73 N.C. App. at 344-45, 326 S.E.2d at 371 (quoting *Leverett v. State*, 399 N.E.2d 106, 110 (Ohio Ct. App. 1978)); *see also Lee v. Corregedore*, 925 P.2d 324, 338 (Haw. 1996) (quoting *Seibel v. Kemble*, 631 P.2d 173, 176-77 (Haw. 1981) (footnote omitted)) (" 'There is much uncertainty in the diagnosis and treatment of mental illness and in the prediction of future behavior.' "); *Hicks v. United States*, 511 F.2d 407, 415 (D.C. Cir. 1975) ("A claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them."); *Tarasoff v. Regents of Univ. of California*, 551 P.2d 334, 345 (Cal. 1976) ("We recognize the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence.")

The uncertainties in diagnosing diseases of the human mind and predicting future behavior were further hampered in the instant case by the setting in which defendant observed plaintiff. Defendant treated plaintiff not in a hospital or private out-patient facility, but in an out-patient student health care facility. Dr. Rogers, a university student counseling center psychiatrist, testified that student health centers provide only "short-term treatment." Dr. Berger, a former counselor at a university facility, likewise testified that a psychiatrist in a student health care setting provides short-term care "before [the student has] to make plans with or without [the psychiatrist's] assistance to get further treatment, or at least make choices in his life." There is no doubt that such a limited setting, coupled with the few number of times defendant observed plaintiff, impeded defendant's

ability to predict and foresee plaintiff's actions eight months after their last meeting.

Our conclusions concerning the foreseeability of plaintiff's injuries and the unpredictability of mental illness are further supported by public policy concerns. A court must "evaluate [the plaintiff's] allegations in light of the goal of treatment, recovery and rehabilitation of those afflicted with a mental disease, defect or disorder." *Seibel*, 631 P.2d at 176. Imposing liability on a psychiatrist in an outpatient, short-term care setting for the actions of a patient that were at most based on risk factors and not foreseeability would have adverse effects on psychiatric care. It would encourage psychiatrists and other mental health providers to return to paternalistic practices, such as involuntary commitment, to protect themselves against possible medical malpractice liability. Despite public perceptions to the contrary, the vast majority of the mentally ill are not violent or are no more violent than the general population and thus, such rigid measures as involuntary commitment are rarely a necessity. *See generally* John Monahan, *Mental Disorder and Violent Behavior: Perceptions and Evidence*, 47 Am. Psychol. 511, 519 (1992) ("None of the data give any support to the sensationalized caricature of the mentally disordered served up by the media, the shunning of former patients by employers and neighbors in the community, or regressive 'lock 'em all up' laws [based on] public fears."); Linda A. Teplin, *The Criminality of the Mentally Ill: A Dangerous Misconception*, 142 Am. J. Psychiatry 593, 598 (1985) ("stereotype[s] of the mentally ill as dangerous [are] not substantiated by our data"). "If a liability were imposed on the physician . . . each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated." *Taig v. State*, 241 N.Y.S.2d 495, 496-97 (N.Y. App. Div. 1963).

In the instant case, plaintiff functioned well under defendant's less-restrictive outpatient care, despite having what his experts termed a very serious mental illness. He passed all of his law school courses, took his medication on a regular basis, and even noted his friends' positive comments on his improved behavior. This improvement came without the need for involuntary commitment. In fact, plaintiff's own experts' testimony established that at the time he was being treated by defendant, plaintiff, like the majority of the mentally ill, was not a candidate for involuntary commitment.

Furthermore, North Carolina's policy on the mentally ill promotes less restrictive methods of treatment and more patient autonomy.

> The policy of the State is to assist individuals with mental illness, development disabilities, and substance abuse problems in ways consistent with the dignity, rights, and responsibilities of all North Carolina citizens. Within available resources, [the State is to provide] services to eliminate, reduce, or prevent the disabling effects of mental illness . . . through a service delivery system designed to meet the needs of clients in the least restrictive available setting, if the least restrictive setting is therapeutically most appropriate, and to maximize their quality of life.

N.C. Gen. Stat. § 122C-2 (1999); *see also Cobo v. Raba*, 347 N.C. 541, 546, 495 S.E.2d 362, 366 (1998) (citation omitted) ("a patient has an active responsibility for his own care and well-being"). It would therefore be irrational to promote unnecessary, more restrictive practices in affirming the judgment below.

We recognize that our jurisprudence in the area of proximate cause is quite varied. *See generally Sutton*, 277 N.C. 94, 176 S.E.2d 161; David A. Logan & Wayne A. Logan, *North Carolina Torts*, § 7.30, at 169 (1996) ("Many of the [North Carolina proximate cause] cases could have been decided differently.") We further recognize that it is only in the rarest of cases that our appellate courts find proximate cause is lacking as a matter of law. *See Hairston*, 310 N.C. at 235, 311 S.E.2d at 566. However, the law of proximate cause " 'cannot be reduced to absolute rules.' " *Sutton*, 277 N.C. at 108, 176 S.E.2d at 169 (quoting Prosser, *supra*, § 50, at 288). This is one of those rare cases where "because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." *Palsgraf*, 162 N.E. at 103 (Andrews, J., dissenting), quoted in *Wyatt*, 57 N.C. App. at 59, 290 S.E.2d at 791; *Westbrook*, 105 N.C. App. at 68, 411 S.E.2d at 654 (citation omitted) ("proximate cause is to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent").

We conclude that given the very specific and novel factual scenario presented by this case, defendant's alleged negligence was not the proximate cause of plaintiff's injuries. Therefore, the trial court should have granted defendant's directed verdict motion made at the close of all the evidence.

Having determined that the trial court erred in failing to grant a directed verdict in defendant's favor based on the issue of proximate cause, we need not address defendant's remaining assignments of error.

Because we find that the trial court erred in failing to grant defendant's directed verdict motion, we reverse the order of the trial court denying a JNOV and remand with directions for the trial court to enter judgment in defendant's favor.

Reversed and remanded.

Chief Judge EAGLES and Judge HUNTER concur.