***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim.
2. This action was filed with the Industrial Commission pursuant to the provisions of the North Carolina Tort Claims Act, N.C. Gen. Stat. § 143-291et seq., against the North Carolina Department of Health and Human Services, which is a department of the State of North Carolina.
3. Defendant filed an Answer with the Industrial Commission denying all allegations of negligence.
4. The employees of the State named were Martin Williams, M.D.; June Waller; and Ralph Berg, M.D.
5. Copies of the records of Christopher John Mayo (hereinafter "decedent") from Cherry Hospital and Duplin-Sampson Area Mental Health, Developmental Disabilities, and Substance Abuse Services (hereinafter "Duplin-Sampson") are true copies, are properly authenticated and relevant, and are properly admitted into evidence.
6. Plaintiffs received $200,000.00 in settlement of their claim against Duplin-Sampson.
7. Plaintiffs incurred funeral expenses in the amount of $6,694.00.
8. The issues to be determined by the Commission are:
a) Whether decedent was injured or damaged by the negligence of a named employee of defendant.
b) What amount of damages, if any, plaintiffs should recover from defendant.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. N.C. Gen. Stat. § 122C-2 requires that mental health patients be treated in the least restrictive setting appropriate for the individual. The 33 counties in the eastern part of North Carolina are served by Area Mental Health Programs, which provide a full range of mental health services. The Area Programs provide intake assessment, diagnoses, treatment planning and mental health service delivery for citizens in their areas. The State of North Carolina operates four acute care psychiatric hospitals, one of which is Cherry Hospital in Goldsboro. Because the patient's freedom is greatly restricted, the hospitals' goals are to move its patients to the least restrictive setting available in the community.
2. Involuntary commitment to the hospitals is strictly regulated by statute. Because of the restrictions on the patient's freedom, statutory checks and balances are in place to prevent improper placement in the hospital. In order to be committed to Cherry Hospital, a petition must be filed which alleges a potential patient is mentally ill and a danger to himself or others. An initial assessment must be performed by a qualified mental health professional in the community. If that professional concurs that the patient is mentally ill and a danger to himself or others, then the patient is transported to Cherry Hospital where a second evaluation is performed by a staff psychiatrist. If the staff psychiatrist believes the patient should be admitted, then a chain of events is set in motion to comply with a statutorily required court hearing. A hearing, judicial review, and concurrence is required within 10 days and counsel is appointed to represent the patient. Hearings are held at Cherry Hospital every Thursday. By Tuesday of each week the psychiatrist must have his initial recommendation as to whether the patient should be committed to the hospital or to some lesser treatment, so the paperwork is available for the court hearing. The psychiatrist can change his initial recommendation anytime prior to the court hearing.
3. On June 8, 2000, Ronald S. Mayo, Sr., decedent's father, attempted to commit decedent to Cherry Hospital in Goldsboro. The evaluating psychiatrist, however, did not find decedent to be a danger to himself or others. After decedent's failure to be committed, Mr. Mayo told decedent that to get him any help, decedent would have to be found to be a danger to himself or others. Decedent asked his father what would happen if he hit his brother. At the conclusion of their conversation, decedent hit his brother.
4. On June 9, 2000, decedent, age 15, was admitted to Cherry Hospital on the petition of his father. Mr. Mayo alleged that decedent had a history of mental illness, struck his older brother, used cocaine and marijuana, and was not sleeping. Decedent previously received intermittent treatment from Duplin-Sampson.
5. Ralph Berg, Jr., M.D., evaluated decedent upon admission to Cherry Hospital. Decedent denied any suicidal or homicidal ideations and stated that although he thought about death in the past, he would never hurt himself. Dr. Berg's diagnostic impression was rule out intermittent explosive disorder and rule out oppositional defiant disorder. Martin Williams, M.D., was the staff psychiatrist assigned to evaluate and treat decedent during his commitment to Cherry Hospital. Dr. Williams first became aware that decedent was a patient on Monday morning, June 12, 2000. Dr. Williams received a briefing on new patients from June Waller and Lula Newkirk, the social worker and nurse, respectively, on duty. Dr. Williams learned that decedent was admitted Friday night, June 9, 2000, and that Dr. Berg completed decedent's initial assessment.
6. Decedent was referred from Duplin-Sampson with the diagnoses of oppositional defiant disorder and major depressive disorder. Dr. Berg did not note any suicide risk and no problems were noticed while decedent was on the ward over the weekend. The medical records showed that decedent ate well, slept well at night, and interacted with his peers. Decedent's family visited with decedent over the weekend and the visit was uneventful.
7. Dr. Williams reviewed everything in decedent's medical chart, including the examination in the community by Winston Jennings, Jr., M.D. at Duplin-Sampson, the petition for involuntary commitment, Dr. Berg's assessment, the referral sheet filled out by the unit director of the adolescent unit, the physical examination report, the progress notes, vital signs, any laboratory reports, and ward and shift reports.
8. The report on decedent was routine without any indication for suicide precautions. Dr. Williams did note that decedent cried while on the telephone, which is fairly common for adolescents who are admitted. Dr. Williams spoke with decedent the morning of June 12, 2000 and reviewed with him the information from Dr. Jennings' commitment and referral, as well as Dr. Berg's assessment and the information that one of the hospital nurses collected. Dr. Williams specifically asked decedent about Mr. Mayo's allegations that decedent struck his brother and used drugs. Decedent responded, "Well, they're trying to get me some help and the only way they can get me in anywhere is if I'm a danger to myself or someone else. And I said `So what would happen if I punched my brother?'" Decedent also stated, "I love my brother and I don't want to do anything to hurt him, but this is what was said that we had to do to get some help." Decedent stated that he tried cocaine five times over a year before, that he used marijuana three to four weeks prior to admission, that he did not drink much, and that he did not have any alcohol in the immediate preceding time. Decedent's blood test results of June 13, 2000, confirmed that he did not have any cocaine, alcohol, or marijuana in his system and did not have a history of heavy alcohol abuse.
9. Dr. Williams performed a suicide risk assessment of decedent on June 12, 2000. Decedent denied any suicidal ideations. Decedent said he made one statement that others interpreted to be suicidal, but that he would never hurt himself. Decedent said several weeks earlier, after an argument with his father, "they will find me by the side of the road." Neither decedent nor his brother, who heard this statement, considered it a suicide threat. In fact, decedent's brother, Ronald Mayo, Jr., never heard decedent make any suicidal threats. Decedent never made any plans for suicide, like saving up medications or identifying a firearm. Dr. Williams found decedent had passive thoughts about suicide, as opposed to active thoughts. Decedent's only other violent act toward another person occurred over a year earlier when decedent pushed his mother onto a bed after she slapped him during an argument. Decedent also admitted he broke a window with his fist during an argument with his father. Dr. Williams considered decedent's drug use a high-risk indicator but determined from the blood tests and decedent's statements that the drug use indicator was outweighed by other factors, including decedent's verbalized desire to continue with treatment, his relationship with his girlfriend, his lack of physical health problems, his age and gender, and a mental health diagnosis of oppositional defiance disorder as opposed to major depression. Dr. Williams found that decedent did not meet the diagnostic criteria for major depressive disorder, which would be a key risk factor for suicide.
10. Dr. Williams met with decedent every day for 20 minutes from their first meeting on Monday, June 12, 2000, until decedent's discharge on Thursday, June 15, 2000. In addition, Dr. Williams was on the ward four to five hours per day and was able to observe and evaluate decedent's actions. Decedent's charts showed that he was eating and sleeping normally, was taking care of his personal needs, and was interacting appropriately with others. Decedent had one argument with his father on June 14, 2000 and threw a soda can, but decedent was easily redirected.
11. On June 12, 2000, June Waller, ACSW, LCSW, spoke to Deborah Wells, decedent's caseworker at Duplin-Sampson, to learn about decedent's treatment and diagnoses. After speaking with decedent in the morning, Ms. Waller completed a Comprehensive Biopsychosocial History and Assessment on decedent. Later that afternoon, Ms. Waller, along with Dr. Williams, met with decedent's family and it was determined that decedent would be discharged from Cherry Hospital on June 15, 2000 with a recommendation for outpatient commitment at Duplin-Sampson. Dr. Williams stated that he would make that recommendation to the court on Thursday. Decedent told Dr. Williams that he would like to live with a relative in another state. Mr. Mayo told Dr. Williams that it was not a possibility for decedent to live with anyone else. Dr. Williams testified that in the absence of a clear and present danger, it is always therapeutically most appropriate to keep a family together who loves one another.
12. An Aftercare Plan for Community Follow-up was developed for decedent and was sent to Duplin-Sampson. Pursuant to that plan, decedent was to receive weekly individual therapy, group anger management therapy, substance abuse therapy included in the weekly therapy, and in-home therapy as an option. The Plan also indicated that there had been a problem with compliance and that if the Plan was not working, alternate living arrangements were to be considered for decedent. Decedent, his father, and Dr. Williams, June Waller and Lula Newkirk, the members of decedent's treatment team, signed the Aftercare Plan. The Aftercare Plan was then sent to Duplin-Sampson.
13. On June 15, 2000, Ms. Waller met with decedent and his father for a discharge conference. Ms. Waller discussed the family's need to work on communication, as well as the parents' need to "pick their battles" with decedent. Based on her contact with decedent, Ms. Waller did not feel that decedent was a risk for suicide. While Ms. Waller felt decedent had some anger management problems, she could not predict that decedent would become violent after being discharged. Ms. Waller hoped decedent and his family would become involved in therapy, utilize available services, and develop appropriate methods of dealing with anger and communicating with each other.
14. On June 15, 2000, the court discharged decedent to his parents with an outpatient commitment order to Duplin-Sampson. The responsibility for decedent's care and treatment transferred to Duplin-Sampson upon decedent's discharge from Cherry Hospital.
15. Decedent's psychiatric care at Duplin-Sampson was provided by Mohammad Abu-Salha, M.D. Decedent initially presented to Dr. Abu-Salha on July 9, 1999 when he was brought in by his parents, who complained that decedent had been depressed, unhappy and had an altercation with his mother. At that time, Dr. Abu-Salha diagnosed decedent with major depression and family conflicts, and recommended treatment with Prozac and family therapy. Decedent had not made any suicidal threats. Dr. Abu-Salha next saw decedent on August 23, 1999. Decedent's family told Dr. Abu-Salha that decedent showed improvement in his behavior and mood, and was beginning to show improvement with his depression. Dr. Abu-Salha recommended continuation of therapy and Prozac and planned to follow-up in three months. Rather than follow-up with this treatment, decedent's parents discontinued decedent's therapy and medication because decedent was doing better and was acting like himself.
16. Dr. Abu-Salha next saw decedent on June 23, 2000, a little over a week after his discharge from Cherry Hospital. This appointment was the first time that Dr. Abu-Salha had seen decedent in eight months. Decedent was again arguing with family members and Dr. Abu-Salha discussed options with decedent and his father. Dr. Abu-Salha and Mr. Mayo concurred that decedent should stay with a family friend on a temporary basis to help defuse the situation at home and until an alternative foster home placement could be found. Dr. Abu-Salha performed a suicide risk assessment at that time and believed that the out-of-home placement would substantially reduce any suicide risk. Dr. Abu-Salha discussed recommitment to Cherry Hospital with the Mayos but neither Dr. Abu-Salha nor decedent's father was inclined to pursue recommitment. On June 21, 2000, Duplin-Sampson developed a treatment plan for decedent and that plan was implemented, with the only alteration from the Aftercare Plan being the out-of-home placement of decedent. Dr. Abu-Salha believed that the treatment plan was an appropriate plan for decedent at that time.
17. On July 9, 2000, decedent returned to his parent's home, in violation of Dr. Abu-Salha's recommendation and order. Decedent and his father argued. While decedent's father was on the phone calling the sheriff to come pick up decedent, decedent grabbed a knife from a kitchen drawer and stabbed himself in the chest. Decedent died immediately from the self-inflicted wound.
18. David Alan Bartholomew, M.D. testified as defendant's expert. Dr. Bartholomew is the medical director and an attending physician on the adolescent unit at the University of North Carolina Hospital in Chapel Hill and is also an assistant professor at the University of North Carolina School of Medicine. Dr. Bartholomew was board-certified in psychiatry in 1999 and board certified in child and adolescent psychiatry in 2001. From 1995 — 1999 he worked as a contract physician with Dorothea Dix Hospital in Raleigh and with Wake County Human Services, performing assessments to determine whether patients needed inpatient commitments and hospitalization.
19. Dr. Bartholomew reviewed the complete medical records of decedent from Cherry Hospital and Duplin-Sampson, a letter written by a psychologist who saw decedent while he resided in Missouri immediately prior to his admission to Cherry Hospital, and the depositions of Dr. Berg, Dr. Williams, June Waller, Dr. Abu-Salha and the Mayo family members. Dr. Bartholomew testified that he is familiar with the standard of care provided by psychiatrists in inpatient State psychiatric hospitals in 2000 and that Dr. Berg and Dr. Williams met the standard of care in the diagnosis, assessment, treatment, evaluation and discharge planning of decedent. Dr. Bartholomew testified that decedent did not have many of the risk factors for suicide and it was not reasonably foreseeable that decedent was likely to harm himself upon discharge from Cherry Hospital. Dr. Bartholomew also testified that on the date of decedent's discharge, it was appropriate to place decedent back in his home.
20. Plaintiff presented Catherine Norton Dulmus, Ph.D, CSW, ACSW, as an expert witness in social work. Ms. Dulmus, however, has never been licensed as a social worker in the State of North Carolina, had never been to Cherry Hospital, had not reviewed the policies and procedures for social workers at Cherry Hospital, and had no knowledge as to whether or not the adolescent unit at Cherry Hospital was similar to the facilities at which she worked in New York. Ms. Dulmus testified that she believed the bio-social assessments at Cherry Hospital were below accepted practices and standards. In the year 2000, when the assessment for decedent was done, Ms. Dulmus did not review a psycho-social assessment done in North Carolina. Ms. Dulmus was not familiar with the social work policies, practices and procedures at the adolescent units at Dorothea Dix Hospital, Broughton Hospital, or John Umstead Hospital, nor did she review any of the North Carolina mental health policies and procedures for social work in its State facilities. Ms. Dulmus was not aware of any of the North Carolina policies and procedures on treatment team planning that were in place in 2000, and specifically was not aware of what services were available for residential treatment in North Carolina in June of 2000. Her social work experience in inpatient facilities was not done in North Carolina. Ms. Dulmus was not aware of how many counties fell within the Cherry Hospital catchment area. The Commission finds Ms. Dulmus' testimony as to a violation of the standard of care by June Waller to be unpersuasive and not supported by the greater weight of the evidence.
21. Plaintiff also presented Pleas Blair Rogers Geyer, M.D., as an expert in child psychiatry and social work. Dr. Geyer testified that he believed Dr. Williams' initial evaluation, treatment and discharge planning fell below the standard of care. Dr. Geyer erroneously concluded that Dr. Williams failed to do a risk assessment and inquire about any past suicidal statements of decedent. Dr. Geyer also mistakenly concluded that there was no observation of the family interaction with decedent, that Dr. Williams was not aware of decedent becoming angry during a visit with his father and throwing a can, and that Dr. Williams did not see decedent every day that Dr. Williams was on duty prior to discharge. It is further noted that Dr. Geyer only participated in two or three-dozen involuntary commitment hearings in North Carolina over a 10-year period. Dr. Williams participates in approximately 300 commitment hearings per year. Dr. Geyer works in a private non-profit fee-for-service hospital and not in a State operated facility. Further, Dr. Geyer's hospital provides for outpatient services directly, unlike that of Cherry Hospital where outpatient services are performed by a third party provider, such as Duplin-Sampson. Dr. Geyer also testified that he believed the social worker's services fell below the standard of care. The Commission finds Dr. Geyer's testimony not persuasive and gives greater weight to the testimony of Dr. Bartholomew.
22. Plaintiffs argue defendant was negligent in discharging decedent into the home setting rather than to an out-of-home placement, and that it was predictable that some injurious consequence would result for decedent. The Full Commission finds that it was not reasonably foreseeable upon discharging decedent to an outpatient commitment at Duplin-Sampson on June 15, 2000 that decedent would injure himself by committing suicide while under Duplin-Sampson's care.
23. After considering all of the evidence, the Commission finds that plaintiffs failed to prove by the greater weight of the evidence that defendant's officers, agents and employees deviated from the standard of care in their provision of services to the decedent.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSION OF LAW
1. In order for plaintiffs to prevail in a negligence claim, plaintiffs must show that defendant owed decedent a duty of reasonable care, that defendant was negligent in that care, and that such negligence was the proximate cause of decedent's injuries and damage. Williamson v. Liptzin,141 N.C. App. 1, 10, 539 S.E.2d 313, 318 (2000), cert. denied,353 N.C. 456, 548 S.E.2d 734 (2001).
2. Proximate cause is a cause which in the natural and continuous sequence produced the plaintiff's injury, without which the injury would not have occurred and one from which a person of ordinary prudence could have reasonably foreseen that consequences of an injurious nature would result under all the facts as they existed. Hairston v. Alexander Tank Equipment Co., 310 N.C. 227, 311 S.E.2d 558 (1984). Foreseeability is a requisite of proximate cause. Nance v. Parks, 266 N.C. 206, 146 S.E.2d 24
(1966). To prove forseeability, plaintiffs must show that "defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." Williamson at 10, 539 S.E.2d at 319. While the element of foreseeability is necessary to reach proximate cause, the defendant is not required to "foresee events which are merely possible but only those which are reasonably foreseeable." Id. at 11 (citing Hairston v.Alexander Tank Equipment Co., supra). The court in Williamson further held,
 If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered remote rather than a proximate cause. It imposes too heavy a responsibility for negligence to hold the [tort-feasor] responsible for what is unusual and unlikely to happen or for what was only remotely and slightly possible.
Id.
2. Decedent's death was not proximately caused by any negligence on the part of any named officer, employee or agent of the State of North Carolina while acting within the scope of his or her office, employment, service, agency or authority. Therefore, under the law, plaintiffs are not entitled to damages. N.C. Gen. Stat. § 143-291 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiffs' claim for damages is DENIED.
2. The parties shall bear their own costs.
This the 20th day of May 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER