***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillip Holmes and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The July 22, 1994 right knee injury, which is the subject matter of this claim (IC No. 466926), had earlier been consolidated for mediation and hearing with a January 31, 2000, left knee injury (IC No. 010073). The January 31, 2000, left knee injury occurred while plaintiff was employed with a different employer, Richmond Community College, and covered by a different carrier, Zurich Insurance Company. Joint mediation was held with Zurich Insurance Company and ITT Hartford, which resulted in Zurich entering into a clincher agreement with plaintiff resolving all issues pertaining to the left knee injury. The parties in the instant case were unable to reach an agreement and the case was then set for hearing May 22, 2002, before Deputy Commissioner Holmes.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
 4. Plaintiff sustained an admittedly compensable injury on July 22, 1994.
5. An employment relationship existed between the employee and employer on July 22, 1994.
6. The employee's average weekly wage was $142.50 which yields a compensation rate of $95.00.
7. Plaintiff's medical records were stipulated into evidence.
 ***********
Based on the credible evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACTS
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 55 years old. At the time of the original injury on July 22, 1994, she was 46. She attended school to the 10th grade and then when she was approximately 40 years old she obtained her GED.
2. Plaintiff was employed by defendant Carolina Restaurant Group (Wendy's) as an attendant to the hot bar at the time of the original injury to her right knee. In addition, she had a second job driving a school bus and a third job cleaning houses. Of these three jobs, the school bus job was her primary employment.
3. On July 22, 1994, plaintiff sustained an accidental injury to her right knee arising out of and in the course of employment with Wendy's when she slipped on degreaser in a back room of her employment and struck her right knee on the wall at a distance of approximately three feet from where the slide began. The parties agreed to a stipulated average weekly wage of $142.50, which yields a compensation rate of $95.00 per week.
4. Plaintiff had no complaints of right knee problems prior to the July 22, 1994 injury by accident. Plaintiff attempted to return to work with Wendy's following the accidental injury but was unsuccessful; similarly for a period of time she attempted to return to her primary employment, that of driving the school bus, but ultimately she was unsuccessful in that as well. She continued having trouble with her right knee but later found at job at Richmond Community College.
5. Following a short course of treatment with Dr. J. Stanley Vetter that included physical therapy, plaintiff was referred to Dr. Ward S. Oakley, Jr., an orthopaedist with Pinehurst Surgical Clinic. Due to continued discomfort, Dr. Oakley ordered arthroscopic surgery, which was performed October 13, 1994. The procedure involved right knee arthroscopic lateral meniscal repair; lateral tibial plateau arthroplasty and chondroplasty patella. Plaintiff showed some improvement following the meniscal repair, but did continue to experience pain and discomfort in the right knee.
6. In March 1995, Dr. Oakley noted that a bone scan showed slight increased uptake in the lateral compartment of the right knee. Dr. Oakley opined that plaintiff's problem was an arthritic condition aggravated by the injury of July 22, 1994.
7. Plaintiff's right knee continued to cause severe pain and discomfort. Dr. Oakley continued to treat with injections and medications, and in January 1996 he ordered an MRI and a repeat bone scan.
8. Plaintiff's knee did not respond to conservative treatment; therefore, in February 1996, Dr. Oakley recommended a total knee replacement. However, the insurance carrier refused to authorize the surgery and there was a delay in treatment for several months until August, 1996, when plaintiff decided to proceed with the total knee replacement on her own through her group health insurance at her new place of employment. Dr. Oakley performed a right knee total arthroplasty on August 26, 1996. Thereafter, in September 1996, plaintiff was not making any progress in bending her knee and in fact, with bending, the knee became tighter and tighter.
9. On October 10, 1996, Dr. Oakley went back into the right knee with an arthroscope and performed debridement, partial synovectomy and manipulation. Plaintiff was discharged with continuous passive motion and continuous epidural infusion. Plaintiff's condition improved somewhat but in January 1997 she returned to Dr. Oakley with complaints of pain and swelling in the right knee. Dr. Oakley treated with pain medication and anti-inflammatories. Thereafter, her condition stabilized until she slipped at work on an ink pen and suffered a patella sprain to the right knee. Dr. Oakley treated plaintiff for both right knee and left knee pain for several months following slipping on the pen at work in June 1997. The left knee was injected. Thereafter the right knee pain resolved and arthritis was noted to be present in the left knee.
10. On December 18, 1997, Dr. Oakley performed a right knee arthroscopy to remove scar tissue and in his operative report Dr. Oakley noted ". . .extensive peripatellar scar, not only the superior pole, but also inferior pole." Following this third arthroscopy, plaintiff's condition stabilized, although she was never without pain in her knee. On June 23, 1998, plaintiff returned with a lot of pain in her right knee. Dr. Oakley's assessment was "right knee failure of implant." Dr. Oakley felt further surgery was the only opinion other than leaving the knee as it was. All of the medical procedures on the right knee were eventually paid by the carrier, ITT Hartford.
11. Because of Dr. Oakley's assessment, the carrier referred plaintiff to Dr. Mauerhan of The Miller Clinic for an independent evaluation as to whether additional surgery would be of benefit. Dr. Mauerhan recommended no further surgery because of accumulated scar tissue, that surgery would only make the matter worse and that plaintiff should continue to try to work as long as possible. Dr. Mauerhan acknowledged that plaintiff had chronic right knee pain that would be permanent and progressive. Dr. Mauerhan found plaintiff to be at maximum medical improvement with a fifty (50%) percent permanent partial impairment with a painful total knee replacement.
12. As of the 1998 evaluation by Dr. Mauerhan, plaintiff was fifty years of age and was earning $289.38 per week with Richmond Community College as a custodian in the maintenance department. Her job required climbing stairs, bending, stopping, prolonged standing and walking, all of which were in excess of her restrictions from Dr. Oakley and Dr. Mauerhan. Continuing to work caused plaintiff daily pain but she could not afford to quit her employment and did her job as well as she could. She would use her left leg to pull up her right leg when climbing stairs; she otherwise used her left leg to compensate for her right knee.
13. Plaintiff fell on ice at Richmond Community College in January 2000. The fall did not injure the right knee but did injure the left knee. Plaintiff fell on black ice in the Richmond Community College parking lot while taking out the trash. When she realized she was going to fall, she guarded her right knee and took the blow to the left knee. The left knee became increasingly painful and on April 27, 2000, Dr. Oakley repaired the left knee torn meniscal tissue by standard arthroscopic revision. No new injury was ever mentioned regarding the right knee.
14. On October 2, 2001, Dr. Oakley assigned a 22% permanent partial impairment rating to left knee following arthroscopic surgery and the standard restrictions following the meniscectomy to the left knee were general restrictions only. Dr. Oakley did not assign any specific permanent restrictions secondary to the left knee surgery, but did relate in deposition general restrictions for such a procedure with the caveat that some people do better or worse than the general restrictions. Following the meniscectomy plaintiff never returned to work at Richmond Community College, where her job required kneeling, squatting, climbing and prolonged standing and walking. These were the same restrictions with respect to the left knee that had been given to plaintiff for the 1994 right knee injury.
15. The Richmond Community College fall did not increase the disability to the right knee; however, because plaintiff could not favor her right knee by relying on her left knee, she was unable to attempt her job following surgery even though the restrictions were unchanged. Zurich Insurance, the carrier for Richmond Community College, paid N.C. Gen. Stat. § 97-29 benefits until plaintiff reached maximum medical improvement on October 2, 2001. Dr. Oakley, the treating physician for both knee injuries, was of the opinion that the 2000 left knee injury "was the straw that broke the camel . . . that put her over the edge."
16. The 1994 right knee injury, IC No. 466926, which is the subject matter of this claim, and the 2000 left knee injury, IC No. 010073, were consolidated and a joint mediation was held October 11, 2001. Zurich agreed that plaintiff reached maximum medical improvement in October 2001, and the left knee did not preclude plaintiff from working. Plaintiff did not need or receive treatment for her left knee since reaching maximum medical improvement in October 2001. Zurich Insurance Company on behalf of Richmond Community College resolved its liability in the consolidated case by entering a clincher agreement with plaintiff resolving all issues pertaining to the left knee injury. By the fall of 2001, plaintiff's left knee had healed and her right knee replacement appliance had continued to deteriorate. There is no evidence that plaintiff's fall of January 31, 2000, accelerated the microscopic shedding of the right knee appliance which is a normal wear and tear process.
17. On May 7, 2002, Dr. Oakley ordered an arthroscopic evaluation of the right knee, which revealed that significant scar tissue and shedding of the plastic surface of the tibia had resulted in microscopic plastic particles being released into the knee cavity. This in turn had produced synovitis, inflammation and pain. Dr. Oakley was of the opinion, and the Full Commission finds as fact, that the right knee swelling and pain were chronic in nature and would be permanent. This was consistent with his earlier impression and the concurring opinion of Dr. Mauerhan in August 1998, who suspected significant scar tissue formation. Of course, neither doctor could document the microscopic shedding without arthroscopic evaluation. Dr. Oakley was also of the opinion, and the Full Commission finds as fact, that the shedding of the plastic would continue in the right knee until such time as the plastic surface of the right knee replacement was repaired or replaced. Dr. Oakley indicated that plaintiff's right knee restrictions included no bending, stooping, crawling, limited climbing, frequent change of position with sitting no more than ten to fifteen minutes, limited walking and limited standing. He also indicated that the restrictions for the left knee would be light restrictions, if any and while they may have appeared similar to the restrictions for the right knee, the restrictions for the left knee were standard and not indicative of plaintiff's actual ability to use the left knee. This supports the position that plaintiff was on the verge of going out of work due to her July 22, 1994, compensable injury prior to the January 2000 fall. Dr. Oakley felt that the left knee injury in 2000, along with the right knee injury in 1994 initially combined to produce plaintiff's total disability; however, Dr. Oakley felt that the right knee was by far the more significantly injured knee and that after reaching maximum medical improvement he did not anticipate any further treatment for the left knee.
18. The clincher agreement made by Zurich on behalf of Richmond Community College for the left knee injury in IC No. 010073 resulted in N.C. Gen. Stat. § 97-29 benefits being paid through February 4, 2002. Plaintiff has received no further benefits from either carrier since that time. Despite demand and evidence that plaintiff's failed right knee appliance has caused total disability, defendant ITT Hartford has refused to reinstate N.C. Gen. Stat. § 97-29 benefits. Plaintiff has never made an election of benefits regarding the right knee and has never been paid benefits for the fifty percent disability to the right knee.
19. Plaintiff would elect benefits under N.C. Gen. Stat. § 97-29 as the more favorable remedy. It is important to note that plaintiff never made an election of benefits in IC No. 010073, the 2000 left knee injury either; rather, plaintiff negotiated with both ITT Hartford and Zurich Insurance Company on how to resolve all issues involving the separate injuries. Zurich resolved its responsibility for all other potential claims and waiver of all other rights by clincher agreement. ITT Hartford did not settle, so that the issue of its responsibility for benefits has not been finally adjudicated until this case. Plaintiff has never made an election of benefits in either case. The issue before the Commission is whether plaintiff is entitled to benefits under N.C. Gen. Stat. §97-29; and whether, or in what amount, apportionment should apply.
20. The medical expenses for treatment to the right knee have been accepted by the carrier, Hartford; however, historically surgeries were neither authorized nor paid by the Hartford in a timely fashion. Plaintiff introduced evidence at hearing that on at least three prior occasions Hartford did not authorize medically reasonable treatment and did not make prompt payment. The arthroscopic surgery of May 7, 2002, to the right knee and the right knee treatment leading to the May 7, 2002 surgery are causally related to the initial injury of 1994 and should have been authorized and paid by Hartford.
21. Plaintiff's chronic right knee pain and swelling were the effective cause of plaintiff's total incapacity to work. Plaintiff had ongoing pain and difficulty following her return to work. According to Dr. Mauerhan, defendants' doctor, ". . . she continued to have extreme pain" but did nothing about it from the standpoint of seeking medical treatment because Dr. Mauerhan indicated "I do not think she should undergo any further surgery on the knee." Dr. Mauerhan had been clear in his report found on page 115 that
 For this reason I think she falls in the category of one percent of patients who have persistent pain following total knee replacement which defy explanation. I do not think she should undergo any further surgery on the knee.
 She will have trouble with squatting and stair climbing activities but these are activities she can avoid at work. I do think for the purposes of her disability that she has fifty (50%) percent permanent partial impairment in that she does have a painful total knee replacement which is giving her difficulty.
He also stated
 It is my impression that she has reached her maximum medical improvement and probably will have chronic pain in the knee. I do think this lady can continue in her current employment and she will have a better outlook and socialization working than not working in that the knee is going to hurt in either situation. She will have trouble squatting and stair climbing activities but these are activities that she can avoid at work. I do think that for the purposes of her disability that she has a fifty (50%) percent permanent partial impairment in that she does have a painful total knee replacement which is giving her difficulty.
22. In determining total disability where there are two separate injuries, it is necessary to consider not only plaintiff's physical limitations but also her testimony regarding pain in determining the extent of her incapacity to work and earn wages such as pain might cause with respect to each knee. The Commission must consider medical evidence that plaintiff suffers from genuine pain as the result of the physical injury combined with her own credible testimony that her pain was so severe that she was unable to work. Webb v. Power Circuit, Inc.,141 N.C. App. 507, 512, 540 S.E.2d 790, 793 (2000); Knight v. Wal-Mart,141 N.C. App. 1, 8, 562 S.E.2d 434, 440 (2000) The 1994 right knee injury which is the subject matter of this case is the predominant cause of plaintiff's total disability under N.C. Gen. Stat. § 97-29; however, the 2000 left knee injury operated initially and temporarily to produce her total disability for a period of time following that injury.
23. Given plaintiff's restrictions of no kneeling, squatting, climbing, sitting for more than fifteen minutes, no prolonged walking and further considering that her only jobs have been manual labor, and given her age, education, her other health conditions and given Dr. Oakley's testimony, plaintiff has proved that she is physically incapable of any employment and that it would be futile to seek work because of the aforementioned factors in conjunction with the other restrictions of pain. Hilliard v. Apex Cabinet Company, 305 N.C. 593, 595, 290 S.E.2d 682,684 (1982). Therefore, plaintiff is totally disabled under the provisions of N.C. Gen. Stat. § 97-29 as the result of the July 22, 1994 right knee injury. N.C. Gen. Stat. § 97-2(6)(9)]
24. Plaintiff's 1994 right knee injury resulted in a 50% permanent partial impairment, as well as chronic pain. Additional surgery is anticipated. Plaintiff has a 20% permanent partial impairment to the left knee with lighter restrictions and no anticipated future surgery. Were it not for the right knee injury, plaintiff would be able to work.
25. Considering the disability ratings, the testimony of Dr. Oakley and Dr. Mauerhan, the testimony of plaintiff and weighing all of these factors, including chronic pain and the improvement of the condition of the left knee, the May 22, 1994 right knee injury is fully responsible for plaintiff's total disability after reaching maximum medical improvement for the left knee. This is supported by the medical evidence and the testimony of the parties.
26. Benefits under N.C. Gen. Stat. § 97-29 should be paid effective February 4, 2002, the date payment was last made by Zurich Insurance Company for the 2000 left knee injury. Defendants should not be given credit for payments made to plaintiff under the clincher agreement in the 2000 left knee injury case since the clincher agreement is irrelevant and there is no statutory provision allowing any credit to be applied from the clincher agreement to the payment of benefits under N.C. Gen. Stat. § 97-29.
27. Our legislature and our courts have dealt with the issue of apportionment of loss in sequential injury cases. The instant case is one of first impression. Neither our statutes nor our case decisions have addressed the issue of apportionment where there is an injury to a scheduled body part where the case remains open and an election has not been made; and the same injured employee at a different employment sustains an injury to a different scheduled body part. Under these circumstances a number of considerations arise such as which employer should bear the loss, which average weekly wage should apply, should the injured employee bear a portion of the loss, how do the various injuries impact on the capacity to earn wages and whether the relative degree or impact of each injury can be approximated in terms of the resulting disability. A review of the current status of the statutory law and the case law on apportionment results in a conclusion that apportionment must apply in the instant case if the second injury to the left knee on January 31, 2000, contributed permanently to plaintiff's total disability. The Full Commission finds that it did not.
28. North Carolina General Statutes §§ 97-33, 97-34, 97-35, 97-51
and 97-57 have all dealt directly with the issue of apportionment, or the resolution or elimination of apportionment issues. None of these statutes govern the fact situation in the instant case.
N.C. Gen. Stat. § 97-33 by its terms deals only with scheduled benefits under N.C. Gen. Stat. § 97-31. It does not apply to benefits pursuant to N.C. Gen. Stat. § 97-29. Since IC No. 010073 resulted in a compromise settlement that did not determine whether benefits were due pursuant to N.C. Gen. Stat. § 97-31 or N.C. Gen. Stat. § 97-29, Section 97-33 is inapplicable. Additionally, by this Opinion and Award the Full Commission determines that benefits are due pursuant to N.C. Gen. Stat. § 97-29, not N.C. Gen. Stat. § 97-31.
N.C. Gen. Stat. § 97-34 deals with persons entitled to compensation for a previous injury in the same employment. This case involved a previous injury in a different employment; therefore, this section is inapplicable.
N.C. Gen. Stat. § 97-35 also deals only with subsequent injuries in the same employment and with N.C. Gen. Stat. § 97-31
injuries rather than N.C. Gen. Stat. § 97-29 injuries.
N.C. Gen. Stat. § 97-51 deals with joint employment, which is not applicable to the facts of this case.
N.C. Gen. Stat. § 97-57 deals only with occupational disease cases. This is an injury by accident case rather than an occupational disease case.
29. Numerous cases have addressed apportionment in terms of last injurious exposure in cases arising out of N.C. Gen. Stat. § 97-52
and N.C. Gen. Stat. § 97-53. The instant case is not an occupational disease case and the law of "last injurious exposure, however slight" is inapplicable; accordingly, the Deputy Commissioner's reliance uponAnderson v. A.M. Smyre was determined under a misapprehension that the law of last injurious exposure in occupational diseases applied in sequential injuries to different body parts at different employment.
30. There is a substantial risk, because of the failed knee replacement, of the necessity of future medical compensation.
 ***********
Based upon the foregoing findings of fact and stipulations, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury to her right knee on July 22, 1994. N.C. Gen. Stat. § 97-2.
2. This compensable knee injury resulted in total knee replacement of the right knee. The total knee replacement failed, resulting in loss of ability to use the right knee normally and resulting in chronic pain. Given plaintiff's restrictions of no kneeling, squatting, climbing, sitting for more than fifteen minutes, no prolonged walking and further considering that her only jobs have been manual labor, and given her age, education, her other health conditions and given Dr. Oakley's testimony, plaintiff has proved that she is physically incapable of any employment and that it would be futile to seek work because of the aforementioned factors in conjunction with the other restrictions of pain. Hilliard v. Apex Cabinet Company, 305 N.C. 593, 595, 290 S.E.2d 682,684 (1982). Therefore, plaintiff is totally disabled under the provisions of N.C. Gen. Stat. § 97-29 as the result of the July 22, 1994 right knee injury. N.C. Gen. Stat. § 97-2(6)(9).
3. Plaintiff is entitled to compensation at her compensation rate of $95.00 per week from and after February 4, 2002 for the remainder of her life. N.C. Gen. Stat. § 97-29 and Hillard, supra.
4. Plaintiff is entitled to have defendants provide medical treatment as necessary to obtain relief and to be reimbursed by defendants for any such treatment paid by others in the past as a result of her compensable right knee injury. N.C. Gen. Stat. § 97-25.
5. Plaintiff is entitled to future medical compensation. N.C. Gen. Stat. § 97-25.1.
6. Apportionment does not apply, considering the facts of this case. N.C. Gen. Stat. §§ 97-33, 97-34, 97-35, 97-51 and 97-57.
7. Defendants, separate employer and separate carrier, are not entitled to the benefit of the clincher agreement approved in IC No. 010073. That clincher was a compromise settlement agreement that did not provide plaintiff compensation equivalent to her $95.00 compensation rate from this plaintiff for the remainder of her natural life. There is no double compensation involved. N.C. Gen. Stat. §§ 97-33, 97-34, 97-35.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee set forth below, defendants shall pay to plaintiff compensation at the rate of $95.00 per week from February 4, 2002, for the remainder of plaintiff's life. As much of same as has accrued to the filing date of this Opinion and Award shall be paid in a lump sum, with interest at 8 percent per year from May 22, 2002 until paid. Defendants shall pay 75% of the lump sum and all of the interest to plaintiff and shall pay the remaining 25% and no interest to plaintiff's attorney. Defendants shall pay $95.00 per week thereafter to plaintiff, but shall pay every fourth check to plaintiff's attorney.
2. Defendants shall pay, or reimburse those who paid, medical compensation pursuant to N.C. Gen. Stat. § 97-25 and shall pay future medical compensation pursuant to N.C. Gen. Stat. § 97-25.1.
3. Defendants shall pay the costs.
This 29th day of December 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN