* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Tort Claims Act.
2. There is no question as to misjoinder or nonjoinder of any party.
3. Plaintiff is a citizen and resident of Siler City, North Carolina.
4. Defendant North Carolina Department of Transportation is a State agency, and the named allegedly negligent State employee is Jeremiah Joel Johnson, transportation worker.
5. Plaintiff's injury occurred on October 11, 2002 in Siler City, North Carolina.
6. The parties introduced numerous exhibits which are a part of the evidence of record.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Early morning on October 11, 2002, the county 911 Emergency Center or Siler City Police Department contacted Ricky Ellington, defendant's local transportation supervisor, regarding a large tree limb that had fallen onto the westbound travel lane of Martin Luther King, Jr. Boulevard (hereinafter "MLK Boulevard"). MLK Boulevard is located within the town limits and has an authorized speed limit of 35 m.p.h. The weather conditions had been rainy and stormy during the prior night and early morning. Mr. Ellington was familiar with Department of Transportation rules and regulations regarding traffic control devices and responding to emergency road situations, as well as with backhoe operations.
2. At approximately 5:15 a.m., while it was still dark, Mr. Ellington drove by the scene and assessed the situation. Mr. Ellington felt that the tree limb should be removed as soon as possible and that it was an emergency situation. Mr. Ellington stated that the area around the limb was a "work zone" as contemplated by Department of Transportation Work Zone guidelines, or the Manual on Uniform Traffic Control Devices (hereinafter "MUTCD") and therefore cones or signs were not required by Department of Transportation guidelines. Mr. Ellington estimated that the limb could be removed in about five to ten minutes, once a backhoe arrived on the scene. He also felt that no traffic control devices were necessary because the backhoe operator could set up in the "no parking" zone outside the travel lane, so there would be no need to stop traffic in the westbound lane. DOT regulations did not require that cones, flares or traffic barriers be carried in the backhoe. Mr. Ellington stated that it would have taken Jeremiah Johnson, transportation worker for defendant, more time to set up traffic control devices, which were not required, than it would to have the backhoe complete the removal of the tree limb. MLK Boulevard is a wide city street with streetlights across from the "no parking" zone and traffic was expected to be light in the early morning hours.
3. Mr. Ellington contacted Mr. Johnson and told him to drive a backhoe to the location and remove the tree limb from the travel lane. Driving the backhoe to the scene was the quicker than loading the backhoe onto a flatbed trailer and towing it to the scene. Mr. Ellington instructed Mr. Johnson several times to be sure to have every light operating as he drove the backhoe.
4. As Mr. Johnson drove to the site, he had on the backhoe headlights, backlights and flashing amber four-way lights on the front and back so that he could see to drive in the dark. It was still dark outside and raining heavily. When Mr. Johnson arrived at the scene, he observed a large tree limb partially blocking the westbound lane of MLK Boulevard, between North Third Court and North Second Avenue. After assessing the scene, Mr. Johnson parked the backhoe in the "no parking" zone outside and parallel to the westbound travel lane of MLK Boulevard, as instructed by Mr. Ellington. The "no parking" zone was marked with yellow diagonal lines and bordered a "parking" zone with white lines to the east.
5. The front of the backhoe and its front bucket were facing east, toward westbound traffic on MLK Boulevard, and the back of the backhoe and its tail boom and bucket were facing west, toward the tree limb. Mr. Johnson was careful to make sure that his backhoe was positioned entirely within the "no parking" zone so that he would not interfere with traffic in the westbound travel lane.
6. Mr. Johnson specifically remembered lowering the front bucket of the backhoe on the inside of the yellow line marking the "no parking" zone. He saw the edge of the front bucket through the cab's glass window and ensured that the bucket did not extend beyond the yellow line into the travel lane.
7. At one point, Mr. Johnson raised the front bucket slightly to allow the backhoe's front headlights to reflect light onto the road's surface, so that Mr. Johnson could ensure that the bucket and backhoe were not parked in the travel lane. After determining that the backhoe was not in the travel lane, Mr. Johnson turned around in the cab's chair and began grabbing the tree limb with the rear clamshell bucket.
8. After Mr. Johnson removed the tree limb from the road and placed it near the sidewalk, he lifted the rear outriggers, turned the front wheels of the backhoe, and prepared to back the backhoe onto the sidewalk to further move the tree limb onto the lawn of a residence.
9. At approximately 5:49 a.m., plaintiff was operating a 1986 Buick automobile traveling in the westbound lane of MLK Boulevard in Siler City, North Carolina. Street lights illuminated portions of MLK Boulevard and the area where the backhoe was located. As plaintiff drove in the direction of the backhoe, he remembered seeing at least two blocks beyond the backhoe to the traffic signal lights on North Chatham Avenue, although he did not remember seeing the backhoe or its headlights.
10. The headlights on the front of the backhoe, along with the rear work lights, were operating at the time of the collision, along with the flashing amber lights atop the backhoe's cab. Mr. Johnson was in the "no parking" zone facing toward the west when plaintiff's vehicle collided with the right edge of the backhoe's front bucket. The collision caused extensive damage to the front of plaintiff's vehicle and forced the backhoe backwards about 10 feet and swung the front bucket into the travel lane slightly.
11. Plaintiff did not remember leaving the travel lane and crossing into the "no parking" zone. As a result of the collision, plaintiff sustained extensive injuries and required hospitalization and physical rehabilitation.
12. After the collision, Mr. Johnson called Mr. Ellington on a cell phone and told him about the accident. When Mr. Ellington arrived on the scene about 20 minutes later, the backhoe's headlights and flashing four-ways lights were on and the backhoe was in the "no parking" zone, except that the front bucket extended into the travel lane about five to six inches. Plaintiff's car was at an angle to the backhoe, with the rear of the car near the center yellow line of MLK Boulevard.
13. Officer David Bishop, the investigating officer for the Siler City Police Department, arrived at the scene minutes later and remembered the backhoe being at an angle to the roadway, with the lights on the backhoe being on. Officer Bishop did not remember how far, if at all, the backhoe extended into the travel lane. Officer Bishop testified that it is against motor vehicle law and improper for a motorist to leave a travel lane and drive through a "no parking" zone.
14. The westbound lane of MLK Boulevard curves slightly to the south prior to the location where the backhoe was being operated, requiring motorists in the westbound lane to turn the wheel to the left to stay in the travel lane. If a motorist did not turn to the left and follow the travel lane, he would travel through the parking and "no parking" zones where the backhoe was located.
15. James M. Green, P.E., a professional forensic engineer, was accepted as an expert in the area of accident reconstruction for defendant and conducted an engineering analysis to determine the causal factors relating to the accident. Mr. Green performed nighttime tests using an exemplar backhoe with identical headlamps and concluded that the head lights on Mr. Johnson's backhoe were shining directly into the path of plaintiff's vehicle, were clearly visible from 300 feet, and should have been clearly visible to plaintiff prior to the collision. He also concluded that, assuming plaintiff was traveling the posted speed limit of 35 m.p.h., plaintiff had approximately 5.81 seconds to observe the backhoe head lights, react, and avoid hitting the backhoe. It was Mr. Green's expert opinion that Mr. Johnson, the backhoe driver, was conducting an emergency clearance of a fallen tree limb in a proper manner within the accepted safety guidelines and that in order to strike the backhoe, plaintiff had to leave the travel lane and drive through the "no parking" zone.
16. Mr. Green has extensive experience in roadway and traffic control design. He testified that the engineering community has difficulty designing traffic control devices and roadway infrastructure to accommodate drivers with peripheral vision problems, such as those experienced by plaintiff. Mr. Green was of the opinion that even if the backhoe was parked in the travel lane, the lights on the backhoe should have been clearly visible to plaintiff, giving plaintiff sufficient time to avoid the collision.
17. Prior to the collision, plaintiff was on Social Security disability due to diabetes and kidney problems. Plaintiff also suffered from end-state renal disease and retinopathy caused by diabetes mellitus and peripheral vascular disease and required kidney dialysis three times a week. He had several toes amputated and his right leg amputated due to diabetes and subsequently was placed on a kidney transplant list.
18. According to plaintiff's testimony and his medical records, plaintiff had a history of vision problems caused by his diabetes, both prior to and after the accident, that were not causally related to the accident. On November 5, 2002, plaintiff was seen by Dr. Gloria Liu at UNC Hospitals, when it was noted that plaintiff's right eye vision was decreased. On July 2, 2003, plaintiff was seen at UNC Health Care because he had problems with the vision in his right eye secondary to traction retinal detachment remotely with extensive RPE atrophy and a pale optic nerve, and was diagnosed with quiescent proliferative diabetic retinopathy with decreased vision in the right eye. Other medical notes indicate that plaintiff had multiple right eye surgeries, a detached retina with blindness; and a history of right eye blindness secondary to diabetic retinopathy.
19. Michael Sutton, P.E., accepted as an expert in the area of accident reconstruction for plaintiff, was of the opinion that the location of the backhoe in the "no parking" zone, with no traffic control devices for the westbound lane, did not violate any Department of Transportation rule or regulation or the MUTCD.
20. However, Mr. Sutton was of the opinion that the backhoe was in the travel lane at the moment of impact. Mr. Sutton relied on Officer Bishop's accident report regarding the location of the vehicles at the moment of impact, although Officer Bishop did not actually observe the locations and the vehicles were moved prior to Officer Bishop arriving on the scene. Mr. Sutton admitted that he could not testify with any certainty whether the gouge marks his assistants found in the westbound lane were caused by the backhoe's front bucket or plaintiff's vehicle, because he did not examine either vehicle. Mr. Sutton indicated that Mr. Johnson did not park one of his outriggers on the sidewalk, while the evidence showed that the outrigger was parked on the sidewalk.
21. Mr. Sutton concluded that the backhoe bucket would have been very difficult to see from plaintiff's direction of travel, but Mr. Sutton failed to conduct any night-time tests to determine the distances at which the backhoe or bucket could be seen at night by a vehicle's headlights. Mr. Sutton also did not conduct any tests to determine at what distance the backhoe lights could be seen by an approaching driver.
22. Both Mr. Ellington and Benny Sloan, defendant's highway maintenance engineer for Chatham County and supervisor of Mr. Johnson and Mr. Ellington, testified that they were familiar with Department of Transportation rules and regulations relating to traffic control and road emergencies. They testified that Mr. Johnson did not violate any Department of Transportation rules or procedures in responding to the limb removal and that the area around the backhoe was not considered a work zone and did not require traditional traffic control devices, such as signs or cones. Mr. Sloan and Mr. Ellington determined that under the emergency circumstances, Mr. Johnson acted appropriately and therefore Mr. Johnson was not disciplined in any way as a result of the incident. All warning lights on the backhoe were working properly and being operated at the time of the accident.
23. Mr. Sloan was familiar with the lane shift in MLK Boulevard's westbound lane. The lane shift was located shortly before the accident site and Mr. Sloan stated that the lane shifts about ten feet to the left for a westbound vehicle. If a vehicle does not shift to the left and follow the travel lane, then the vehicle would travel straight into the "parking" and "no parking" zones.
24. The Full Commission gives greater weight to the expert testimony of Mr. Green than to that of Mr. Sutton, in part because Mr. Sutton failed to conduct any tests to determine the distances at which the backhoe or bucket could be seen at night by a vehicle's headlights or at what distance the backhoe lights could be seen by an approaching driver. The Commission finds that the collision occurred as the result of plaintiff's leaving the lane of travel and driving into the "no parking" zone, striking the backhoe being driven by Mr. Johnson.
25. The Full Commission finds that Mr. Johnson did not violate any Department of Transportation rule or regulation during the emergency removal of the tree limb on October 11, 2002. Mr. Johnson acted properly in the emergency situation and had the backhoe's lights turned on and shining directly into plaintiff's path. As such, defendant was not negligent in its duty of care.
26. Plaintiff, however, failed to keep a proper lookout and to exercise ordinary care on October 11, 2002.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkir v.N.C. State University, 321 N.C. 706, 365 S.E.2d 898 (1988).
2. In order for plaintiff to prevail in a negligence claim, plaintiff must show that defendant owed plaintiff a duty of reasonable care, that defendant was negligent in that care, and that such negligence was the proximate cause of plaintiff's injuries. Bolkir v. N.C. StateUniversity, supra; Williamson v. Liptzin, 141 N.C.App. 1, 10,539 S.E.2d 313, 318 (2000), cert. denied, 353 N.C. 456, 548 S.E.2d 734
(2001).
3. Plaintiff's injury was not proximately caused by any negligence on the part of any named officer, employee or agent of the State of North Carolina while acting within the scope of his or her office, employment, service, agency or authority. Therefore, under the law, plaintiff is not entitled to damages. N.C. Gen. Stat. § 143-291 et seq.
4. Even assuming arguendo that there was negligence by a named State employee, plaintiff would still be entitled to no damages as he failed to exercise ordinary care and was contributorily negligent for the injury he sustained on October 11, 2002. Clark v. Roberts, 263 N.C. 336,139 S.E.2d 593 (1965).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be and the same is hereby DENIED.
2. Each side shall bear its owns costs of this action.
This 15th day of December 2006.
 S/_________________________ LAURA KRANIFELD MAVRETIC, COMMISSIONER
CONCURRING:
 S/______________________ THOMAS J. BOLCH, COMMISSIONER
 S/________________________ CHRISTOPHER SCOTT, COMMISSIONER