RHONDA F. BURGESS, Plaintiff v. JOSEPH CAMPBELL, M.D., ALAN L. ROSEN, M.D., RALEIGH OB/GYN CENTRE, P.A., F/K/A HAYES HOLT RAPPAPORT & CAMPBELL, P.A, CAPITAL RADIOLOGY ASSOCIATES, P.A., AND DUKE UNIVERSITY HEALTH SYSTEM, INC. (A North Carolina Corporation), D/B/A RALEIGH COMMUNITY HOSPITAL, Defendants

No. COA06-165

(Filed 3 April 2007)

1. **Appeal and Error— appealability—summary judgment for one defendant—substantial right—risk of inconsistent verdicts**

    Although plaintiff's appeal from the trial court's grant of summary judgment in favor of one of the defendants is.an appeal from an interlocutory order in a medical malpractice case, the order is immediately appealable because it affects a substantial right when this case involves multiple defendants with the same factual issues, and different proceedings may bring about inconsistent verdicts on those issues.

2. **Medical Malpractice— causation—summary judgment**

    The trial court erred in a negligence and negligent infliction of emotional distress case arising out of a medical malpractice by granting summary judgment in favor of defendant Dr. Rosen, because: (1) plaintiff's expert witness opined that Dr. Rosen, in evaluating the plaintiff's initial ultrasound films, failed to detect an intrauterine pregnancy and this testimony could support a finding that Dr. Rosen breached a duty owed to plaintiff; and (2) whether this alleged failure by Dr. Rosen either misled the treating physicians or caused them to engage in a plan of treatment resulting in plaintiff's injuries is a question for the jury.

Appeal by plaintiff from summary judgment order entered 10 May 2005 by Judge James C. Spencer, Jr., in Wake County Superior Court. Heard in the Court of Appeals 30 October 2006.

*Lewis & Roberts, P.L.L.C., by Gary V. Mauney, for plaintiff-appellant.*

*Crawford & Crawford, L.L.P., by Renee B. Crawford and Robert O. Crawford III, for defendant-appellee.*

CALABRIA, Judge.

Rhonda F. Burgess ("plaintiff") appeals an order entered 10 May 2005 granting summary judgment in favor of defendants Alan L. Rosen, M.D., and Capital Radiology Associates, P.A. (collectively "Dr. Rosen"). We reverse.

On 29 November 2001, plaintiff took a pregnancy test in the medical office where she worked and tested positive. Later that same day, she experienced abdominal discomfort and sought treatment at Raleigh Community Hospital's emergency room. Plaintiff was referred to the hospital by Dr. Lewis Stocks ("Dr. Stocks"), a doctor who had a referral relationship with plaintiff's employer. Dr. Stocks specifically requested testing and the hospital performed endovaginal, gall bladder, and pelvic ultrasound examinations, specifically transabdominal and endovaginal ultrasounds.

A total of five ultrasounds were presented to Dr. Rosen, the radiologist on call, to read and interpret. Dr. Rosen reported: "No evidence of an intrauterine pregnancy. The patient's positive pregnancy test may be related to a very early intrauterine gestation, too early to visualize or to an ectopic pregnancy. Further evaluation with endovaginal scan may be useful."

The plaintiff then sought guidance from Dr. Stocks, who told her that it might be too early to determine her pregnancy by an ultrasound examination. He advised her to go home and rest. The plaintiff became alarmed, however, and returned to Raleigh Community Hospital's emergency room, where she was evaluated by Dr. Robert Kratz ("Dr. Kratz"). Dr. Kratz ordered an HCG test, which measures pregnancy-specific hormonal levels. The HCG test revealed hormonal levels consistent with a pregnancy. Dr. Kratz was concerned the two tests showed opposite results—the ultrasound interpreted by Dr. Rosen showing no intrauterine pregnancy and the HCG test showing

an active pregnancy. Dr. Kratz subsequently called Dr. Eric Rappaport ("Dr. Rappaport"), an obstetrician/gynecologist.

Dr. Rappaport performed a diagnostic laparoscopy, in which he inspected the fallopian tubes for a possible ectopic pregnancy and found none. Dr. Rappaport also inspected the ultrasound films originally interpreted by Dr. Rosen and concluded those films showed no evidence of an intrauterine pregnancy. Dr. Rappaport noted in the plaintiff's record, "No ectopic seen on laparoscopy. Review of U/S film—EV done—no IUP. P: admit for observation & recheck of HCG." Dr. Rappaport subsequently referred the plaintiff's care to his partner, Dr. Joseph Campbell ("Dr. Campbell"), also an obstetrician/gynecologist.

When Dr. Campbell first evaluated the plaintiff, he also concluded that she had no viable pregnancy. He based his conclusion on the plaintiff's presentation of pain, the second HCG test showing elevated hormonal levels, and the absence of a definite intrauterine pregnancy on the ultrasound films as reported by Dr. Rappaport. As a result of his initial diagnosis, Dr. Campbell recommended medication for the plaintiff that terminates a pregnancy. Specifically, Methotrexate was administered to induce miscarriage and to prevent a rupture of her fallopian tubes from what Dr. Campbell diagnosed as an ectopic pregnancy.

The plaintiff then followed up with Dr. Rappaport, who ordered another HCG test on 3 December 2001, which showed hormonal levels consistent with a pregnancy of several weeks' gestation. The following day Dr. Campbell performed another ultrasound. This ultrasound showed a nine-millimeter intrauterine yolk sac, indicating an active pregnancy. Dr. Campbell referred the plaintiff to Dr. Stephen Wells, a high-risk pregnancy specialist at Duke University Medical Center. The plaintiff subsequently miscarried.

On 9 July 2003 plaintiff filed an action alleging negligence and negligent infliction of emotional distress against Dr. Campbell, Dr. Rosen, Capital Radiology Associates, P.A., Raleigh OB/GYN Centre, P.A., Hayes Holt Rappaport & Campbell, P.A., and Duke University Health System. Dr. Rosen's motion for summary judgment was granted in an order dated 10 May 2005. From that order, plaintiff appeals.

[1] The first issue we consider is whether this appeal is properly before this Court. In the case *sub judice*, summary judgment was

granted as to one but not all of the defendants and the trial court did not certify that there was "no just reason for delay" as required by N.C. Gen. Stat. § 1A-1, Rule 54(b) (2005). However, N.C. Gen. Stat. § 1-277 (2005) and N.C. Gen. Stat. § 7A-27(d) allow this Court to consider an interlocutory appeal where the grant of summary judgment affects a substantial right. *Id.*

> Entry of judgment for fewer than all the defendants is not a final judgment and may not be appealed in the absence of certification pursuant to Rule 54(b) unless the entry of summary judgment affects a substantial right. See N.C. Gen. Stat. § 1-277 (1996); N.C. Gen. Stat. § 1A-1, Rule 54(b) (1990); N.C. Gen. Stat. § 7A-27(d) (1995). Our Supreme Court has held that a grant of summary judgment as to fewer than all of the defendants affects a substantial right when there is the possibility of inconsistent verdicts, stating that it is "the plaintiff's right to have one jury decide whether the conduct of one, some, all or none of the defendants caused his injuries . . . ." *Bernick v. Jurden*, 306 N.C. 435, 439, 293 S.E.2d 405, 409 (1982). This Court has created a two-part test to show that a substantial right is affected, requiring a party to show "(1) the same factual issues would be present in both trials and (2) the possibility of inconsistent verdicts on those issues exists." *N.C. Dept. of Transportation v. Page*, 119 N.C. App. 730, 736, 460 S.E.2d 332, 335 (1995).

*Camp v. Leonard*, 133 N.C. App. 554, 557-58, 515 S.E.2d 909, 912 (1999). As in *Camp*, this case involves multiple defendants but the same factual issues, and different proceedings may bring about inconsistent verdicts on those issues. Specifically, plaintiff's suit alleges multiple, overlapping acts of medical malpractice resulting in harm, and it is best that one jury hears the case. Accordingly, we determine that the trial court's grant of summary judgment affects a substantial right and this Court will consider plaintiff's appeal.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2005). "On appeal, an order allowing summary judgment is reviewed *de novo*." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004). Following Dr. Rosen's motion for summary judgment, the plaintiff tendered evidence opposing summary judgment. That evidence included the plaintiff's medical records, as well as deposition testimony from

Dr. Rosen, Dr. Campbell, and Dr. Rappaport. It also included the deposition testimony of Dr. Shawn Quillin ("Dr. Quillin"), a radiologist, qualified as an expert pursuant to N.C. Gen. Stat. § 1A-1, Rule (9)(j) (2005).

[2] The specific issue in this case is whether the plaintiff's evidence, viewed in the light most favorable to her, can satisfy the element of causation necessary to support her claims. We determine that the trial court erred in concluding that it cannot.

> North Carolina appellate courts define proximate cause as a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Williamson v. Liptzin*, 141 N.C. App. 1, 10, 539 S.E.2d 313, 319 (2000) (citation omitted). "We . . . recognize that it is only in the rarest of cases that our appellate courts find proximate cause is lacking as a matter of law." *Id.* at 18, 539 S.E.2d at 323.

Here, we consider whether any negligent act or omission by Dr. Rosen could have proximately caused plaintiff's injuries. Dr. Quillin, plaintiff's expert witness, opined that Dr. Rosen, in evaluating the plaintiff's initial ultrasound films, failed to detect an intrauterine pregnancy. However, whether this alleged failure by Dr. Rosen either misled the treating physicians or caused them to engage in a plan of treatment resulting in plaintiff's injuries is a question for the jury.

Dr. Campbell, who prescribed the injection of Methotrexate, testified in his deposition that he did not recall ever seeing Dr. Rosen's report interpreting the ultrasound films. Dr. Campbell was asked, "Did you read [Dr. Rosen's ultrasound report] prior to administering the Methotrexate to—or ordering the administration of Methotrexate to Ms. Burgess?" He answered, ". . . I do not recall specifically seeing the report." Although Dr. Campbell admitted that the lack of an obvious intrauterine pregnancy on the ultrasound films helped him form his opinion that the plaintiff had no viable pregnancy, he testified that he received this information from Dr. Rappaport, who had also personally viewed and interpreted the ultrasound films.

Dr. Rappaport stated that a fluid collection was visible on the ultrasound but that he did not believe the film showed an early ges-

tational sac. Dr. Rappaport testified that he did not remember originally interpreting the reports, but stated in his deposition that the two-millimeter fluid collection on the films was clearly visible. Unfortunately, we cannot determine from the record when Dr. Rappaport first observed the fluid collection. What we can determine is that Dr. Rappaport stated that he generally relies on ultrasound reports to be accurate, and he reached his conclusions by independently evaluating the ultrasound films previously interpreted by Dr. Rosen. During his deposition, Dr. Rappaport was asked, "[I]s it fair to say . . . that nothing that Dr. Rosen did or failed to do on November 29, 2001, caused you to administer any treatment negligently or inappropriately that caused Rhonda Burgess any harm[?]" He answered, "I think that's fair to say." Dr. Rappaport was further asked, "And nothing that Dr. Rosen did in dictating his report misled you into providing treatment or recommending treatment to Rhonda Burgess—or to Dr. Campbell—that you shouldn't have recommended under the circumstances[?]" He again stated, "No, I think that's fair."

This exchange does not necessarily indicate that Dr. Rappaport did not rely on Dr. Rosen's report, but only that he denied administering alleged negligent treatment as a result of the report. It is as plausible to presume Dr. Rappaport was denying liability as it is that he was denying actual reliance on the original radiology report. Although Dr. Rappaport conducted his own evaluation of the ultrasound films and reached his own conclusions, he conceded that he might have questioned his own evaluation if there had been a major difference between his and Dr. Rosen's interpretations of the ultrasound films.

Dr. Quillin, an expert who testified for the plaintiff, raises the first question in his deposition regarding the knowledge that would have affected the patient's treatment plan. Dr. Quillin stated that the presence of the two-millimeter fluid collection was critical, because it demonstrated something was present in plaintiff's uterus, which in turn could have indicated an intrauterine pregnancy. With the knowledge that plaintiff had tested positive for pregnancy but without the knowledge that a fluid sac was present in her uterus, doctors would be much more likely to suspect an ectopic pregnancy, Dr. Quillin stated.

Dr. Quillin's deposition testimony raises another question of fact regarding the plaintiff's treatment plan starting from the original ultrasound. He states that Dr. Rosen should have interpreted the original ultrasound film as showing an intrauterine pregnancy. Dr. Quillin

added, "I think it's within the standard of care to have interpreted the films. The films were not interpreted." When Dr. Quillin was asked what evidence he personally found of an intrauterine pregnancy, his response was, "There is strong evidence, not 100%, that there [was] an intrauterine gestation present."

Thus, the plaintiff forecast evidence capable of overcoming defendant's motion for summary judgment. Specifically, plaintiff's evidence could support a finding that Dr. Rosen, by incorrectly interpreting the original report, breached a duty owed to the plaintiff. Further, the plaintiff forecast evidence capable of supporting a jury finding that Dr. Rappaport relied, at least in part, on Dr. Rosen's report. By his own testimony, Dr. Rappaport might have deferred to the opinion of Dr. Rosen if Dr. Rosen's opinion had differed from his own. As such, any error by Dr. Rosen in interpreting the films might have affected Dr. Rappaport's actions, which in turn may have influenced the treatment later administered by Dr. Campbell. Accordingly, plaintiff has demonstrated a genuine issue of material fact for the jury and the trial court's grant of summary judgment for Dr. Rosen was improper.

Reversed.

Chief Judge MARTIN and Judge TYSON concur.